We have an argument this morning in Case 14-11-4, Kim v. Burwell. Mr. Carbin? Mr. Chief Justice, and may it please the Court, this is a straightforward case of statutory construction where the plain language of the statute dictates the result. Mr. Carbin, will you please back up, because before we get to the question of statutory construction, as you know, each plaintiff, or at least one plaintiff, has to have a concrete stake in these questions. I can't put them as ideological questions. And we have four plaintiffs. As to two of them, there is a declaration stating, I am not eligible for health insurance from the government. But there's a question of whether they are, brethren, eligible for coverage as veterans. Yes, one of those is Mr. Hurst, who would have to, I would refer you to the Joint Appendix at page 42, where this is the government's recitation of facts, where they make it clear that Mr. Hurst would have to spend $750 of his own money because of the IRS rule. Mr. Hurst was a veteran for 10 months in 1970. He is not eligible for any veteran's service, because if you serve such a short amount of health services, if you serve such a — I'll ask the government if they agree that — And I shouldn't point out that the government has never disputed this. And I'd also — But the Court has an obligation to look into it, Your Honor. That's true. But of course, there has been fact-finding by lower courts in an adversarial system. I don't believe the Court does its own — I don't think it was ever brought up in the lower court that the two people were veterans. If I could make one further point on this, Justice Ginsburg. Even if you were technically eligible, which he is not, there's an IRS Rule 26 CFR 1.36B2CII, which says, yes, with the usual clarity of the IRS, sir, making clear that you are only disabled from receiving subsidies if you have actually enrolled in a veteran's health services, and it's undisputed that Mr. Hurst is not. And then there were the two women. I think one of them was going to turn 65 in June, which would make her Medicaid eligible. She would turn 65 in late June. She's obviously subject to the individual mandate. Well, in advance of that, by virtue of the IRS Rule, she would have to spend $1,800 per year for health insurance by virtue of the IRS — But you said she would turn 65 in June. Late June, yes. So let's take care of 2015. No. Right now, she is obliged, under the individual mandate, to have insurance. You have to have insurance for nine months of the year. And so as of April 1st, she will be subject to the penalty, which will be alleviated only by — Again, I'll ask the government if they agree with you on that. And then I think for the fourth point, if there's a question whether she would qualify for a hardship exemption from the individual mandate, even if she received the tax credits, in which case her tax credits would be irrelevant. That's true. Again, I'll refer you to the Joint Appendix at 41. That was the government's argument below. We didn't want to get into a factual dispute about it because we have such clear standing. But you would have to establish the standing, prove the standing, if this gets beyond the opening door. Fair enough, Your Honor. But it's black-letter law that only one plaintiff needs standing, and for the reasons I've already articulated, both a plaintiff-first and plaintiff-lead — I don't want to detain you on this anymore, but I will ask the government what their position is on standing. Thank you. In return for the merits, the only provision in the Act, which either authorizes or limits subsidies, says in plain English that the subsidies are only available through an exchange established by the state under Section 1311. If you're going to elaborate on that, I would appreciate your elaboration. I've read that, and this statute is like the tax code more than it's like the Constitution. There are defined terms, and the words you just used concern a defined term. As I read the definition, there's a section of definitions, and it says, quote, the term exchange means, quote, an exchange established under 1311, and 1311 says an exchange shall be a government agency, etc. That is established by a state. Those are the definitions. Then you look to 1321, and 1321 says if a state does not set up that exchange, then the federal, quote, secretary shall establish and operate such exchange. So it says the secretary is to establish and operate such exchange, the only kind of exchange to which the Act refers, which is, quote, an exchange established by a state under 1311. That's the definition. So the statute tells the secretary set up such exchange, namely, a 1311 state exchange. And there's nothing else in this statute. Correct. So that's throughout what they're talking about. So what's the problem? As Your Honor just said, it tells the secretary to establish such exchange. And what 36B turns on is whether the state or the secretary is established. No, it uses the same terminology, but it's used 15 times in this statute, namely, the terminology in the definition is an exchange established by a state. That's the phrase. Well, under 1311, that is the phrase. And if 1311 created something, the definitional section created some ambiguity as to whether HHS was establishing a 1311 or 1321 exchange, that is immaterial because 36B does not say all 1311 exchanges get subsidies. It says exchange is established by the state under section 1311, not established by HHS under section 1311. So it eliminates any potential ambiguity created by the definitional section. Can I offer you a sort of simple daily life kind of example, which I think is linguistically equivalent to what the sections here say that Justice Breyer was talking about? So I have three clerks, Mr. Carvin. Their names are Will and Elizabeth and Amanda. Okay? So my first clerk, I say, Will, I'd like you to write me a memo. And I say, Elizabeth, I want you to edit Will's memo once he's done. Then I say, Amanda, listen, if Will is too busy to write the memo, I want you to write such memo. Now my question is, if Will is too busy to write the memo and Amanda has to write such memo, should Elizabeth edit the memo? If you were going to create monies to Will for writing the memo and Amanda writes the memo and you say the money will go if Will writes the memo, then under plain English and common sense, no. When Amanda writes the memo... You run a different shop than I do, if that's the way... Because in my chambers, if Elizabeth did not edit the memo, Elizabeth would not be performing her function. In other words, there's a substitute, and I've set up a substitute, and then I've given instructions. Elizabeth, you edit Will's memo, but of course if Amanda writes the memo, the instructions carry over. Elizabeth knows what she's supposed to do. She's supposed to edit Amanda's memo, too. And in your chambers, you're agnostic as to whether Will, Elizabeth, or Amanda writes. But the key point here is, under Section 1311, Congress was not agnostic as to whether states or HHS established an exchange. Well, Mr. Kucinich, if I had those clerks, the same clerks, and Amanda wrote the memo and I received it, and I said, this is a great memo, who wrote it, would the answer be it was written by Will because Amanda stepped into Will's shoes? That was my first answer. The Justice Department didn't accept it, so I'm going to the second answer, which is you are agnostic as between Will and Amanda, but Congress is not agnostic as between states and federal exchanges. That's a very important point, I think, because what you're saying is that the answer to the question really does depend on context, and it depends on an understanding of the law as a whole and whether they were agnostic. I agree with that. So it's not like the simple four or five words, because the four or five words in my example, it's obvious that Elizabeth should edit the memo. It's the whole structure and context of the provision that suggests whether those instructions carry over to the substitute, isn't it? We implore you to examine these words in the context of the act as a whole because our argument becomes stronger for five reasons. To respond to Justice Breyer's point, he says such exchange connotes that it's the same person doing it. But look at the provision on territorial exchanges. It says territories can establish such exchanges, and then it says and shall be treated as a state. Yes, it does. No, it's not a question of connotation. It is a question of denotation. Now, what does that mean? It means that the federal government, the secretary, is establishing a thing for the state. And what is the thing? The thing that it is establishing for the state is defined as an exchange established by the state. Now, that person from Mars who's literal, which I usually am not, but a literalist, I think, would have to read it that way. But if you're not a literalist, well, at least you could read it that way. Now, you want to go into the context. If you want to go into the context, at that point, it seems to me your argument really is weaker. Do the exchanges fall apart? Nobody can buy anything on them? You know the arguments. You've read the briefs. There are no customers. Employers don't have to pay penalties as long as they use just people from Virginia, but one Maryland person comes. You know all those arguments. So how does the context support you? Well, again, under the literalist or non-literalist interpretation, saying that HHS will establish such exchange doesn't suggest that the state has established such exchange. If there was ambiguity in that regard, just to see if I could finish my answer to Justice Breyer, you look at a parallel provision where they use precisely the same language, and they said, and shall be treated as a state, a language which is notably omitted from 1321, and it's a basic principle of statutory construction that you interpret the same phrases the same way, and it shows that Congress knew how to create equivalence between non-state exchanges and exchanges if and when it wanted to. Sorry, Justice Sotomayor. Take a breath. I'm a little concerned with how you envision this provision working. You're saying that the HHS exchange can't be for the state so that it's established by the choice of the state. The choice the state had was establish your own exchange or let the federal government establish it for you. That was the choice. If we read it the way you're saying, then we're going to read the statute as intruding on the federal-state relationship because then the states are going to be coerced into establishing their own exchanges. And you say, oh, no, they can't be coerced. But let's go back to what Justice Breyer was talking about. In those states that citizens don't receive subsidies, we're going to have the death spiral that this system was created to avoid. States are obligated, insurers are obligated, to make sure that in their states, whether they're part of this program or not, that they have guaranteed coverage, that children are covered until they're 26, and that they base their costs on community ratings. So if they have to do that, then costs are going to rise on every insurance plan offered in the country in those 34 states. Three or six or nine of your states will have tightened their Medicaid eligibility requirements in contravention of the Act. So they're taking money by breaking their compacts. They would have to lose all of their Medicaid money. Tell me how that is not coercive in an unconstitutional way. And if it is coercive in an unconstitutional way, in Bond, just I think it was last term, we said that that is a primary statutory command, that we read a statute in a way where we don't impinge on the basic federal-state relationship. This Court has never suggested, outside the very unusual coercion context of the NFIB Medicaid, that a funding condition somehow invades a state police power. Well, we said it last year. No, no, in Bond. There the federal government was taking away a police power. Here the federal government's doing the same. You want billions of free federal dollars. That's hardly invading state sovereignty, and it's the kind of routine funding condition that this Court has held countless times. Let me say that from the standpoint of the dynamics of federalism, it does seem to me that there is something very powerful to the point that if your argument is accepted, the states are being told either create your own exchange or we'll send your insurance market into a death spiral. We'll have people pay mandated taxes, which will not get any credit on the subsidies. Cost of insurance will be sky-high. But this is not coercion. It seems to me that under your argument, perhaps you would prevail in the plain words of the statute. There's a serious constitutional problem if we adopt your argument. Two points, Justice Kennedy. One is the government's never made that argument. Number two, I don't think... Sometimes we think of things the government doesn't. Well, I certainly hope you do in this case, but not on this question. What I'm trying to quite seriously, Justice Kennedy, convey is if this was unconstitutional, then the Medicaid statute that this Court approved in NFIB would be unconstitutional. What would the consequence of unconstitutionality be? Very often you have an ambiguous provision, could be interpreted one way or another way. If interpreting it one way is unconstitutional, you interpret it the other way. Correct. But do we have any case which says that when there is a clear provision, if it is unconstitutional, we can rewrite it? Is there any case we have that says that? No, Your Honor. That was really my point, Justice Kennedy. Think about the consequences of the Medicaid deal as being coercive. Twenty-two states have said no to the Medicaid deal. That has created a bizarre anomaly in the law, that if people making less than the poverty line are not available to any federal funds to help them with health insurance... I fully understand that, but I think the Court and the counsel to both sides should confront the proposition that your argument raises a serious constitutional question. Now, I'm not sure that the government would agree with that, but it is in the background of how we interpret this statute. It may well be that you're correct as to these words, and there's nothing we can do. I understand that. A, there's no savings construction, to echo Justice Scalia's point, but B, the point I want to make on the straight-up constitutionality, if this is unconstitutional, then all of the provisions in the U.S. Code that say to states, if you do something for no child left behind... Well, I'm not sure. In South Carolina versus Dole, where there was a matter of funding for the highways, the first Congress said, if you don't build the highways, you have to go 35 miles an hour all over the state. We wouldn't allow that. No. Well, there, of course, you would be interfering with a basic state prerogative as to establish their limits, and the condition is not related to that. Here, the condition is perfectly related to it. If you want to create something new... Mr. Carver, you referred to the Medicaid example. That's a familiar, a grander name, says to the state, here's the federal money and here's the conditions. Take it or leave it. That's one pattern. But this pattern that we have says flexible state. You can have your program if you want, and if you don't, there's a fallback. There's a federal program. That's a typical pattern. It's the pattern of the Clean Air Act. You can have a state implementation plan, but state, if you don't get up your plan, there's a federal implementation plan. I have never seen anything like this, where if you take what the statute says you can have in 1321, then you get these disastrous consequences. That's why this is much less risky a deal for Congress and what distinguishes it from Medicaid, as the dissenting opinion in NFIB pointed out. In Medicaid, Congress is playing all in, take it or leave it. If they turn down the deal, then Medicaid is completely thwarted. Here, if they turn down the subsidy deal, they still get the valuable benefits of an exchange. What are those benefits? The better the customers that can buy on it, the better the insurers that will sell on it. Well, three points. One is we know textually that they thought exchanges without subsidies worked, because, again, they have territorial exchanges, but the government concedes no subsidies. That's not what you said previously. When you were here last time in this never-ending saga, you said without the subsidies driving demand within the exchanges, insurance companies would have absolutely no reason to offer their products through exchanges, and then you said the insurance exchanges cannot operate as intended by Congress, absent the subsidies. That is entirely true. They wouldn't have operated as intended, because Congress intended all 50 states to take this deal. So why create 1326 at all? Obviously they thought that some states wouldn't. Well, they thought it was possible. Very possible. Because they set up a mechanism for that to happen. And then what happens? You still get the exchange. It's not like Medicaid, where the entire federal program is thwarted. You get the benefits that were thwarted. No one's going to visit the program if there are no subsidies, because not enough people will buy the programs to stay in the exchanges. That is demonstrably untrue and not reflected anywhere in the legislative history. The legislative history quite clearly contradicts that. Many senators got up and said there are very valuable benefits to the exchange. One-stop shopping, Amazon, as President Obama said. The government came in the last case and told you, these two things operate quite independently. We don't need exchange without subsidies. In contrast, there's not a century of legislative history suggesting that without subsidies there will be a death spiral. That was the whole purpose that drove this bill, because states had experimented with this, and those that didn't have subsidies or other provisions of the act didn't survive. You said it yourself in the prior case. No. The prior case was about the individual mandate. The government came in and said the individual mandate is necessary to effect death spirals. No one in the findings in Congress or anywhere else suggested that subsidies were available. Will subsidies reduce the number of people available? My problem is the reverse. You're talking about Congress hiding, borrowing the phrase of one of my colleagues, a huge thing in a mousetrap. Because do you really believe that states fully understood that their citizens were not going to get subsidies if they let the federal government? What senator said that during the hearing? The same amount of senators who said that subsidies were available on HHS exchanges, which is none. They didn't deal with it in the legislative history, just as they didn't deal with Medicaid, because the statute was quite clear. Let's talk about it in context again, Justice Sotomayor. The context is the only provisions in the act establishing any limits on the subsidies is found in 36B. So it's not a mousetrap, it's the place you'd expect to find it. It's the only place in the act that limits subsidies to purchases made on HHS. I don't think that's quite right, Justice Ginsburg. It's a tax code provision. It's an implementation provision. It tells you how you compute the individual amount. It's not in the body of the legislation where you would expect to find it. Your Honor, if that's the case. What Justice Kagan just read to you, you had the idea that the subsidies were essential to have the thing work. That's what you told us last time. What I told you was it wouldn't work as expected. And that's because they thought this deal would work just like the Medicaid deal, where all 50 states would say yes, so you would have both of congressional purposes. Why would they set up the whole extra thing if they didn't think anybody was going to take it? Well, that was my response to Justice Sotomayor. That is a completely unsupported empirical observation made post hoc by amicus. There's no reflection of that in the legislative history. Indeed, the legislative history refutes it. Mr. Carvin, we've heard talk about this other case. Did you win that other case? Or maybe it makes sense that you have a different story today. I'm really glad Your Honor said that. And if I could return your contact. I'm sorry, Mr. Carvin, please. Just very briefly, Justice Kagan, very much appreciated. To respond, we've already talked about context. Section 1311 is a key part of this context. It says in the strongest possible terms we want states to run these exchanges. If you give unconditional subsidies, then of course there is absolutely no incentive for states to do it, and you have fundamentally undermined that distinct statutory purpose. Whereas if you condition subsidies, Congress accomplishes both of its goals. Widespread subsidies plus state-run exchanges. In terms of art, again, there is language in the statute which says exchanges, exchanges under the act. Those phrases naturally encompass both HHS exchanges and state-established exchanges. And yet the solicitor general is coming here to tell you that a rational English-speaking person who is intending to convey subsidies available on HHS exchanges use the phrase exchanges established by the state. He cannot provide to you any rational reason why somebody trying to convey the former would use the latter formulation. Mr. Carvin, why don't you take an extra ten minutes? Maybe we'll give you a little bit more of a chance to talk. Okay. Fine. Well, then I'll ask the question. Well, you can ruin my ten minutes with this. No, I mean, let's go back to this question of where Congress put this thing. Because putting aside constitutional issues, there's at least a presumption as we interpret statutes that Congress does not mean to impose heavy burdens and draconian choices on states unless it says so awfully clearly. And here, and this goes back to what Justice Ginsburg was saying, there's really nothing clear about this. I mean, this took a year and a half for anybody to even notice this language. And as Justice Ginsburg said, it's put in not in the place that you would expect it to be put in, which is where it says to the states, here's the choice you have. It's not even put in where the statute defines who a qualified individual is or who's entitled to get the subsidies. Rather, it comes in in this technical formula that's directed to the Department of the Treasury, saying how much the amount of the subsidy should be. And that seems to be, it both makes no sense from Congress's point of view, in terms of our own point of view, in terms of interpreting statutes, that's not the clarity with which we require the government to speak when it's upsetting federal-state relations like this. I must respectfully disagree for three reasons, Justice Kagan. In the first place, of course, where else would you expect a tax credit except in the tax code? That's where this was. You wouldn't put it in 42 U.S.C., which has nothing to do with taxes. It's the only place where exchange limitation is placed. You have three audiences here, not just states. You have to tell taxpayers what they're entitled to. You have to tell insurance companies when these subsidies are available, and you have states. So you have to put it in 36B. So the argument I guess the government is making is what you should have done is put half of it in 36B and half of it in 1321, which, of course, would have confused everybody. 36B would say sub-exchanges, period. Then you go to 1321 and say, when we said exchanges in 36B, we meant established by the state. If I were a state official and I was trying to decide whether my state should establish an exchange and I wanted to know whether individuals who enrolled in a plan on my possible state-established exchange would get a credit, where would I look? Exactly. The basic thesis here is these exchanges don't work without subsidies. You've read 1311. You've read 1321. Now you're going to go find out where the subsidies are. That's 36B. They're hypothesizing standards. I think not, Mr. Carpenter. I mean, I think the place I would look to find out about my choices is in the provision of the statute that talks about my choices. I think the last place I would look is a provision of the statute that talks about, what is it, coverage months? For purposes of this subsection, which, by the way, isn't even the right subsection, but whatever. That's where I would look, is in where it talks about what a coverage month is. But, Your Honor, I've already described the difficulties of putting in part of it in 1321, right? Because then you would create this bizarre tax credit provision, which is only half true, and you wouldn't tell taxpayers and insurance companies. So I believe that's the complete answer. But the other practical point I'd like to make is they had three years to implement this. No one thought the states were going to have to make a decision overnight. If the IRS had done its job, every state would have been fully informed of the consequences, because presumably they read 36B, and then they would make an intelligent decision well in advance of the 2013 deadline. So this bizarre notion that states were somehow unable to read a statute or to read a regulation is simply not valid. I really want to hear what you're going to say in your 5 to 10 minutes, and if you want, only if you want, I would be interested in your responses to the government's brief, that if you read the words established by the state without reference to the technical definition, as you wish, this isn't just about the taxes. It means employers in Virginia don't have to make policy, don't have to give policies, but if they have one Maryland worker, they do. It means that they never can tighten up their Medicaid regulations, never, in 34 states, but of course in the others they can. It means that there's no qualified person ever to buy anything on an exchange established by the secretary for the state, and they have two or three other anomalies that have nothing to do with taxes, all of which supports their argument that you have to read this phrase technically according to the definition. Now that's their basic point. I tried to summarize it. Do as you wish. I just want you to have 5 or 10 minutes to answer it. Thank you. And the first point is there are no anomalies. I'm going to clock that, see if you get it. The first point I'd like to make is there's no anomaly stemming from our interpretation of 36B. The government agrees with that. Their biggest anomaly is this qualified individual's point about how there would be nobody on HHS exchanges. The Solicitor General is not going to stand up here and tell you that if we prevail in our interpretation of 36B, they will be obliged by the logic of that opinion to empty out HHS exchanges. So we all agree that there's no connection between 36B and the qualified individual. That's point one. Point two is if you want anomalies, their interpretation of the statute requires 34 states today to use all Medicaid coverage. Why is that? Because of the provisions on 64A through 66A of the government's brief. There are various requirements that the state, on payment losing all of its Medicaid funds, must coordinate between the state-established exchange, the state agency for CHIP, and the state agency for Medicaid in terms of secure interface and enrollment. Now, that makes perfect sense if exchange established by the state means what it says, but they think it encompasses HHS exchanges. Well, the state cannot ensure coordination between HHS exchanges and the state agencies, and none of the 34 are doing it today. So under their atextual reading of the statute, 34 states will suffer the penalty that this Court found in NFIB as unconstitutionally coercive. As to this Medicaid maintenance anomaly, the government agrees that the purpose of this provision was to freeze Medicaid payments until you had an exchange with subsidies, which makes sense, right? You want to coordinate the two. And that's exactly what this provision means under our interpretation. Until you have an exchange with subsidies, the states will be frozen. The government says that thing ended on January 1, 2014. That's a figment of their imagination. It's nowhere in the statute, plus which it makes no sense. Before 2014, the states were powerless to have an exchange with subsidies, right? They couldn't do it. So there was a three-year freeze on Medicaid that they were powerless to get out of. After 2014, if they don't want to have their Medicaid frozen, all they have to do is establish an exchange. So it's a less harsh restriction on states, plus which it gives them another incentive in addition to the subsidies to create the state exchange, which is the purpose enunciated in 1311. I don't know, oh, as to, yeah, maybe somebody would, if you had an employee that lived in another state, maybe he would be subject to the employer mandate. Why is that an anomaly? Congress liked the employer mandate. Of course they wanted to expand it. They also never thought it would really happen, because, again, what they thought was going to happen was there wouldn't be neighboring states without it because nobody was going to turn down this extraordinarily generous deal. I don't know if my five minutes are up, but that's my response to these anomalies. As I understand, Wow, you've been talking a long time. You have two more sentences. Even if there were anomalies in these other sections, you don't transport them to 36B, which is confutedly neither absurd and furthers the purposes of the Act, just like in utility air, because the word pollutants didn't work with one section. You don't spread it like a virus throughout the rest of the Act. You clear it in that provision. Those were two long sentences. If and when there's any litigation. Those are long sentences. Yes. I think I'm right that Justice Breyer's question about anomalies, which are replete in the Act under your interpretation, did not talk about what I think is one of the most glaring ones, which is this qualified individuals thing, that you're essentially setting up a system in which these federal exchanges, that there will be no customers. And in fact, there will be no products because section 1311 says that the exchange shall make health plans available to qualified individuals. And then the next section says that qualified individual means an individual who resides in the state that established the exchange. So under your theory, if federal exchanges don't qualify as exchanges established by the state, that means federal exchanges have no customers. Which of course, is not the reading that the government's getting to it because they're not going to tell you. That's because they don't share your theory. No, no, no. That's the result. Well, now let me be as clear as I can. If we prevail in this case, they are not going to empty out the HHS exchanges because they understand that there are numerous defenses, even if you interpret established by the state, literally in the qualified individuals provision. Number one defense that they will use is, it says you have to be a qualified individual with respect to an exchange. As Justice Breyer pointed out, the statutory definition of exchange is a 1311 exchange. So they're only talking about state exchanges, not these HHS exchanges. And it is in section 1312, which immediately follows 1311 before 1321. Number two, qualified individual doesn't mean that, that means you're guaranteed access. It doesn't mean if you're not qualified, you're absolutely denied access. We know that from the illegal alien provision, which says illegal aliens are neither qualified individuals nor eligible for something. But look at that. Look at the prisoner provision, which says prisoners shouldn't be treated as qualified individuals. So under your theory, this statute effectively said that prisoners should be able to enroll on federal exchanges. That makes no sense. It makes perfect sense to say the states get a choice. Think about somebody who's in prison in February. They're getting out in April. They got to buy insurance under the individual mandate. So if you said nobody who's incarcerated can buy insurance, that means they wouldn't be able to buy insurance during the relevant enrollment period. It makes perfect sense to give states the flexibility to say, as to those incarcerated principles, you can make them available for exchanges, but under illegal aliens, we don't want to, which is why we are saying they are neither qualified nor eligible, even if justice, even if you don't find that the most pristine logic to be applied to a statute. Remember, we are interpreting these statutes to avoid an absurd result. And it's a basic principle of statutory construction that you will give a plausible, if not the most persuasive reading to a statute to avoid the result. But we are interpreting the statute generally to make it make sense as a whole, right? We'd look at the whole text. We don't look at four words. We look at the whole text, the particular context, the more general context, try to make everything harmonious with everything else. I think you said, even at the very beginning of this argument, as we were going back and forth about my hypothetical, that of course, context matters and context might make all the difference with respect to what those five words mean. And I think what we're suggesting is that if you look at the entire text, it's pretty clear that you oughtn't to treat those five words in the way you are. I've given you the contextual points before. I think the key one that I'd like to convey to you, Justice Kagan, is section 1311. You say the statute must work harmonious. If you provide subsidies to HHS exchanges, you have essentially gutted section 1311's strong preference for state exchanges. What will happen is precisely what did happen under the IRS rule. Two-thirds of the state are saying, no, we're not going to undertake this thankless task of running these exchanges with no incentives to do so. So yes, what I have here in terms of what the statute means is 46B quite clearly saying exchanges are available only on states. I have 1311 explaining why they limited subsidies to that, and there was no contrary legislative history at all. What do they have? An A text for a reading of 36B, which they can't explain why anybody would have used those words if they wanted to convey those exchanges, a rule that completely undermines the purposes of 1311, and no supporting legislative history. So under all the legal materials that this Court normally used to discern what was going on, we clearly prevail. Thank you, counsel. General Verrilli, you'll have an extra 10 minutes as well. Thank you, Mr. Chief Justice, and may it please the Court. Standing has been raised, so let me start by telling you where we stand on standing, and then I'd appreciate the opportunity after that to summarize what I think are the two key points in this case. Now, with respect to standing, the question, the case or controversy question turns on whether any of the four petitioners is liable for the tax penalty for 2014. Now, this case was litigated in the district court in 2013 based on projections on the part of each of the four petitioners that they would earn a certain income in 2014. They filed declarations saying that. With respect to two of the four, the projections of their income were such that they would qualify for the unaffordability exception, and they wouldn't have standing. With respect to the other two, their projections were such that they wouldn't qualify for the unaffordability exception, and they would have standing. But those were projections in 2013 about their income in 2014. 2014 has now come and gone, and we know, we don't know, but petitioners know whether any of the four have in fact, are in fact liable for the tax penalty, and that will depend on whether their actual income in 2014 matched their projections. Now, Mr. Carbon said there was fact-finding about this. I'm afraid that's not correct. The petitioners did file a motion for summary judgment, but the case was decided on the basis of the government's motion to dismiss before discovery and without any fact-finding. I'm assuming because Mr. Carbon has not said anything about the absence of a tax penalty, that at least one of the four is in fact liable for a tax penalty, but that's the key standing question. Now, with respect to the veteran's point, Your Honor, if it is the case, as Mr. Carbon tells us, that Mr. Hurst was a veteran for only 10 months, then I think he's correct. He would not qualify for VA health care because you generally have to serve two years. So that's where we are in standing. Now, if I could turn to the merits. Are you saying one person does have standing? No, no. It will depend on whether as a factual matter, one of the four has, is in fact liable for the tax penalty for 2014, and that's information that is not in the government's possession. It is in the possession of Petitioner's Counsel. And I should make one more point with respect to 2015. There were no projections. There's nothing in the record about the possible income of any of the Petitioners for 2015. So there's really nothing that would establish a case of controversy for 2014. Well, you're surely not raising the standing question with us here for the first time at oral argument, are you? Well, Mr. Chief Justice, as I said, that based on the projections, it is our, it was our understanding that at least one of the four would be liable for a tax penalty. The question of standing has been raised and I've tried to identify for the court what I think is the relevant question, which is whether any one of the four has in fact, is in fact liable for a tax penalty, because this is on, this is on a motion to dismiss, right? Well, that's correct, Your Honor, but it does also go to this court's jurisdiction because if there's no, if none of the four is liable for a tax penalty for 2014, it just isn't a case for controversy. None of them is liable. There's no, there's no injury. And so I do think that's ultimately the relevant question here. And with respect to standing, I don't think there's a question about veteran status, but I do think that's the relevant question. It's a question before, uh, before us as to standing, whether the district court correctly held in the motion to dismiss context that there was standing, that may not be the end of the matter, but don't we have to, isn't that before us?  that, that may be correct, but yes, but then you, and you might alternatively think about this as a question of mootness, I guess, and that, you know, based on the projection, there was a case of controversy, but if the projection didn't come to pass and none of the plaintiffs is liable for a tax penalty, then the case of controversy no longer exists. Well, what are you suggesting? Should we have a, should we have a trial here? No, I'm not suggesting anything tonight. What the facts are? Justice Alito, I did not raise standing affirmatively. The court raised it and I'm just doing my best to let the court know what our position is on standing. Would you, would you send it back then to, to the district court? Well, I guess, no, I guess what I've said is that, that Mr. Carvin hasn't suggested that, that there is no plaintiff liable for a tax penalty. Based on that, I'm inferring that at least one of the petitioners. Would you, would you, why wouldn't we accept a representation by him? There's no reason. If he, if he makes a representation that at least one of the four is, has, it was liable in 2014 and is liable in 2000, or will be liable in 2015. So I guess, I mean, we know at least one of them won't because that's what I'm saying about that is I'm actually going to step further than that. Justice Sotomayor, given that there, there hasn't been, I'm willing to accept the absence of a representation as an indication that there is a case of controversy here. And, and so that's why Mr. Chief Justice, we haven't raised standing and that's what, but I do think that the key question is whether one of the four is liable for a tax penalty. You have to have that to have a case of controversy. Okay. If I could now, let me please turn to the merits and summarize what I think are the two key points. First, our reading follows directly from the text of the Act's applicable provisions, and it's really the only way to make sense of both section 36B and the rest of the Act. Textually, their reading produces an incoherent statute that doesn't work. And second, our reading is compelled by the Act's structure and design. Their reading forces HHS to establish rump exchanges that are doomed to fail. It makes a mockery of the statute's express status, express textual promise of state flexibility. It precipitates the insurance market death spirals that the statutory findings specifically say the statute was designed to avoid. And of course it revokes the promise of affordable care for millions of Americans. That cannot be the statute that Congress intended. Of course it could be. I mean, it may not be the statute they intended. The question is whether it's the statute that they wrote. I mean, you know, there are no provisions in a statute that turn out to be ill considered and ill conceived. So it's not the statute that they wrote. And the reason it's not the statute that they wrote, I think, I want to actually start, if I could, picking up, I think on a variation of the hypothetical that Justice Kagan asked. In Petitioner's brief, they throw down the gauntlet with respect to a hypothetical about airports. The statute requires a state to construct an airport. It says the federal government shall construct such airport if the state doesn't, and no one would think that the federal government's airport was an airport constructed by the state. Well, what I would say to that is that if those statutory provisions were conjoined with a provision that said airplanes may only land at airports constructed by the state, that you would conclude immediately that a federally constructed airport qualifies as an airport constructed by the state, because otherwise the statute would make no sense. And the same exact thing is true. There are no statutes that make no sense. This one is exactly the case. Every statute must make sense, and we will twist the words as necessary to make it make sense. That can't be the rule. That isn't the rule. But the rule is that you don't read statutory provisions in isolation. You read them in context. The rule is that you read them in order to ensure that the statute operates as a harmonious whole. You read them so that you don't render statutory provisions ineffective. You read them to promote the federal status quo. I mean, you acknowledge that all of what you're saying only applies where there are alternative readings that are reasonable. You pick the one that will do all the things that you say. But if it can only reasonably mean one thing, it will continue to be that one thing, even if it has untoward consequences for the rest of the statute. No. With respect to this statute, first, let me, I want to make two points. First, answer me in principle. I mean, is it not the case that if the only reasonable interpretation of a provision is in the rest of the statute, it nonetheless means what it says? Is that true or not? I think there are, there are a couple of limitations on that principle. The first is, if what you have is a situation in which that creates conflict within a statutory scheme, then the court's got to do its best to try to harmonize and reconcile the provision. Well, I disagree with that. And you have a single case in which we have said the provision is not ambiguous. It means this thing, but Lord, that'd make a terrible statute. So we'll interpret it to mean something else. I think Brown and Williamson's a good example of that. And Brown and Williamson, the court said, look, the definition of drug and drug delivery device would actually seem unambiguously to cover tobacco. But when you read that provision in context and it's in the, and considering the full scope of the regulatory regime, it can't possibly mean that. But let me, let me actually work through the text here because I do think I can show you that there's a quite reasonable reading of this statutory text that allows you to affirm and requires you to affirm the government's position. General Verrilli, before we get too immersed in a number of provisions of this, could you respond to a question that was asked during Mr. Carvin's argument? If we adopt petitioner's interpretation of this act, is it unconstitutionally coercive? So here's what I would say about that, Justice Alito. I think that it would certainly be a novel constitutional question. And I think that I'm not prepared to say to the court today that it is unconstitutional. It would be my duty to defend the statute and on the authority of New York versus United States. I think we would do so, but I don't think there's any doubt that it's a novel question. And if the court believes it's a serious question. I was going to say, does novel mean difficult? Because it does seem to me that if the petitioner's argument is correct, this is just not a rational choice for the states to make, and that they're being coerced. And that you then have to invoke the standard of constitutional avoidance. What I was going to say, Justice Kennedy, is to the extent the court believes that this is a serious constitutional question, and this does rise to the level of something approaching coercion, and I do think the doctrine of constitutional avoidance becomes another very powerful reason to read the statutory text our way. Because I do think, and I do think with respect to the point that Your Honor is making, remember it's not just, it's not just a situation in which there's onerous conditions, onerous consequences for state residents. It's also a profound problem of notice here. That, you know, if you read petitioners, if you take petitioners reading of the statute, then the idea that states were given, you can't possibly justify this as adequate notice to the states. Well, Mr. General Verrilli, let me ask you this about notice. We get lots and lots of amicus briefs from states. And we got two amicus briefs from states here. Thirty-four states, I think that's the number, the states that declined to or failed to establish a state exchange. Correct. Now, if they were all caught off guard and they were upset about this, you would expect them to file an amicus brief telling us that. But actually of the 34, only six of them signed the brief that was submitted by a number of states making that argument. Twenty-three states, 23 jurisdictions submitted that brief. Seventeen of them are states that established state exchanges. Only six of the states that didn't establish state exchanges signed that brief. How do you account for that? So I guess I'd make two points about that, Justice Alito. First, you've got 22 states there, states in both camps, all of whom told you that they didn't understand the statute that way. And with respect to the other eight states that filed the amicus brief on the other side, I actually think there's quite an important point that goes to their understanding of what this Act did. Remember, this is an IRS rule that we're talking about here. And the IRS put out a notice of proposed rulemaking saying this is what we intend to do. And several of these states, Oklahoma, Indiana, and Nebraska, they filed rulemaking comments in that proceeding. And if you look at those rulemaking comments, you will see that they address a number of issues. And they say nothing, nothing about the issue that's before the Court now. So if they really understood the statute as denying subsidies in states that did not set up their own exchanges, that would have been front and center in their rulemaking comments, but they said nothing about it. And I think that tells you a good deal about what everybody understood that this statute was denying. Well, there's another point on notice on this PENTERS argument that seems curious to me. Usually when this argument comes up, a state has signed up for a federal program, and then they say, oh, my gosh, we didn't realize what we had gotten ourselves into. But here, it's not too late for a state to establish an exchange. If we were to adopt the petitioner's interpretation of the statute. So going forward, there would be no harm. Well, let me address that directly, and then I'd like to make a broader point about statutory context and response. Now, directly, of course, I don't think it's possible to say there would be no harm. The tax credits will be cut off immediately, and you will have very significant, very adverse effects immediately for millions of people in many states. Well, I said going forward. And then after the current tax year. And then going forward. And would it not be possible if we were to adopt the petitioner's interpretation of the statute to stay the mandate until the end of this tax year, as we have done in other cases where we have adopted an interpretation of the Constitution or a statute that would have very disruptive consequences, such as the Northern Pipeline case? Sure. The Northern Pipeline is an example of doing that, and it will be up to the court to decide whether it has the authority to do that. I will say this does seem different than Northern Pipeline to me because this is about money going out of the federal treasury, which is a different scenario. But obviously if that's where the court's going and that's what the court thinks the proper disposition is, that would reduce the disruption. But I think it's another important point to make here, just as a practical matter, the idea that a number of states, all these states, or a significant number, are going to be able in the six months between when a decision in this case would come out and when the new year for insurance purposes would begin, will be able to set up exchanges, get them up and running, get all the approvals done, I think is completely unrealistic. How long is it taking? Just to give you an example of the current timeline, Justice Ginsburg, in order to have an exchange approved and insurance policies on the exchange ready for the 2016 year, those approvals have to occur by May of 2015. So that gives you a sense of the timeline that HHS is operating under. What about Congress? Do you really think Congress is just going to sit there while all these disastrous consequences ensue? I mean, how often have we come out with a decision, such as the bankruptcy court decision, Congress adjusts and acts a statute that takes care of the problem. It happens all the time. Why is that not going to happen here? Well, this Congress, Your Honor, I don't care what Congress you're talking about. If the consequences are as disastrous as you say, so many million people without insurance and whatnot, yes, I think this Congress would act. But the relevant question, and I'm going to try to get back to the point I was trying to make in response to Justice Alito's question, the relevant question here is what did the Congress that enacted this statute in 2010 do? Did they really set up a system in which the States are subject to the kind of onerous situation that the Petitioner claims? And I think there are three textual indications, objective textual indications, that that cannot possibly have been the statutory scheme that Congress tried to set up. First is the existence of the federal exchanges. It would make no sense, no sense, for Congress to have provided for federal exchanges if, as Mr. Carvin suggests, the statutory design was supposed to result in every State establishing its exchange. Second, well, wouldn't it have been, again, talking about federalism, a mechanism for States to show that they had concerns about the wisdom and the workability of the Act in the form that it was passed? So, Justice Kennedy, I think the federalism values are promoted by our interpretation. If that is indeed what a State thought, if a State really would have preferred not to have the State government participate in the implementation of this Act for reasons that Your Honor identified, the structure of the Act that Congress put in place and that we're advocating for today fully vindicates that concern. They can decide not to participate without having any adverse consequences visited upon the citizens of the State. And that's why our reading is the pro-federalism reading. It's their reading, and it seems to me, that is the anti-federalism reading. And that's a powerful reason to reject it. And if I could go to the second statutory point, which is related to what we're talking about, Justice Kennedy, which is Section 1321 says that this statute is designed to afford State flexibility. State flexibility. It would be an Orwellian sense of the word flexibility to use it in the manner that petitioners say the statute uses it because it's the polar opposite of flexibility. And the third point, it seems to me, is the notice point, that if indeed the plan was, as Mr. Carvin said, that every State was going to establish an exchange for itself and that that would cure all of the massive statutory anomalies and textual anomalies and absurdities and impossibilities that his reading provides for, if that was really the plan, then the consequence for the States would be in neon lights in this statute. You would want to make absolutely sure that every State got the message. But instead what you have is a subclause in Section 36B, which is a provision that addresses the eligibility of individual taxpayers for taxpayers. This is not the most elegantly drafted statute. It was pushed through on expedited procedures and didn't have the kind of consideration by a conference committee, for example, that statutes usually do. What would be so surprising if, among its other imperfections, there's the imperfection that what the States have to do is not obvious enough? It doesn't strike me as inconceivable. So, Justice Scalia, I'm going to answer that question by talking about the legislative process, because I think it is quite relevant, and I think it ought to be quite relevant even to you with respect to the question you just asked. The language here in 36B was not the product of some last-minute deal. It wasn't the product of scrambling at the end. The language that emerged here, the statutory structure, with the language of 36B about tax credits, the language that's in 1311, the language that's in 1321, was the product of the Senate Finance Committee markup, which went on for weeks and weeks. It was a public hearing. Frankly, it was covered by C-SPAN. You can go watch it on the C-SPAN archives if you want to, and you will see coming out of that that the understanding, the clear understanding was that this statutory setup would result in subsidies being available in every State. There were Senators, were there not, who were opposed to having the federal government run the whole thing because they thought that would lead to a single-payer system, which some people wanted. And the explanation for this provision is it prevents the federalization of the entire thing. No, Justice Scalia, I... That's certainly a plausible explanation of why the provision's there. Mr. Carvin has floated that as an explanation, and he suggests that it was Senator Ben Nelson who required it. There's absolutely no contemporaneous evidence, none whatsoever, that anybody thought that way, that the solution to the problem Your Honor has identified is what Congress did in having States have the option to set up their own exchanges with State-by-State federal fallbacks rather than national system. Senator Nelson has made clear, he has stated, that he had no intention of the kind, there's no contemporaneous evidence at all that anyone did. And what Mr. Carvin has suggested is that this was the product of some deal to try to get votes so the Act would get passed. What I would suggest to Your Honor is that there is objective proof that that is not true. The provisions in the Act that were negotiated at the end to secure the necessary votes are in Title X of the Act. And if you look in the Act, pages 833 to 924, that's Title X. You can see all of the amendments. Not a single one has anything to do with the statutory language before the Court. The puzzle that's created by your interpretation is this. If Congress did not want the phrase established by the State to mean what that would normally be taken to mean, why did they use that language? Why didn't they use other formulations that appear elsewhere in the Act? Why didn't they say established under the Act? Why didn't they say established within the State? Why didn't they include a provision saying that an exchange established by HHS is a State exchange when they have a provision in there that does exactly that for the District of Columbia and for the territories? It says that they are deemed to be States for purposes of this Act. So why would they do that? Of course, the provision doesn't say established by the State with a period after State. It says established by the State under Section 1311. And our position textually is, and we think this is clearly the better reading of the text, that by cross-referencing Section 1311, effectively what Congress is doing is saying that exchanges established through whatever mechanism, exchanges set up by States themselves— So you're saying that by cross-referencing 1311, they really mean 1311 and 1321. Yes, and I do think that, and let me walk through why I think that's true. That seems to me to go in the wrong direction in your case, not in the right direction. No, I think it goes in the right direction, if you'll just ride with me for a little bit, Justice Kennedy. Before you get on to that, your answer doesn't explain why by the State is in there. Then why didn't they say established under 1311? Well, so the second point is that wherever this provision appears in the Act established by the State under Section 1311, it's doing work. And the work it's doing is saying what we're talking about is the specific exchange established in the specific State as opposed to general rules for exchanges. If you look at the Medicaid maintenance of effort provision, it works the same way. Why didn't they say in the State? That's the phrase you just used, in the State. Why didn't they say in the State? Because, suppose they could have, but it worked perfectly well this way. If you look at the qualified individual provision, it's clearly how they're using it with respect to the qualified individual provision. With respect to that provision, it says a qualified individual is a person who is located, who resides in the State that established the exchange. Clearly what they're talking about is a geographical reference to the particular State. That's what's going on there, and it's going on every time the statute uses that phrase. So it's doing that work, and that's why it's in there. But now if I could go back to your point, Justice Kennedy. It says established by the State under Section 1311. Section 1311b1 says each State shall establish an American health benefits exchange for the State. It's not, as Mr. Carvin said, an urging that States do it. It says each State shall establish. Now, we know that when Congress used that language, each State shall establish, it must have meant something more inclusive than each State government shall itself set up the exchange. We know that because Congress is legislating against the backdrop of the Tenth Amendment, and so it couldn't impose that requirement. And we know that because of Section 1321. Because Section 1321 provides the means by which the 1311b1 requirement is satisfied. It can be satisfied by a State electing to meet the Federal requirements for exchanges, or it can be satisfied in the event that a State doesn't or tries but comes up short by HHS stepping in and establishing the exchange. So when the statute says each State shall establish, it really means the Federal government shall establish if the State doesn't establish. I think the right way to think about this, Justice Alito, is that what's going on here is that the right place to focus, let me put it that way, the right place to focus here is not on the who but on the what, on the thing that gets set up and whether it qualifies as an exchange established by the State. And these exchanges do qualify, and the reason they qualify is because they fulfill the requirement in Section 1311b1 that each State shall establish an exchange. And 1321 tells you that because it says to the HHS that when a State hasn't elected to meet the Federal requirements, HHS steps in, and what HHS does is set up the required exchange. It says such exchange, which is referring to immediately prior to the required exchange, where the only exchange required in the Act is an exchange under Section 1311b1. So it has to be that that's what HHS is doing under the plaintext of the statute is fulfilling the requirement of Section 1311b1 that each State establish an exchange. And for that reason, we say it qualifies as an exchange established by the State. That's reinforced, as Justice Breyer suggested earlier, by the definition, which says that an exchange is an exchange established under Section 1311. 1311, again, has 1311b1, which says each State shall establish an exchange. And it has to be that way because petitioners have conceded, and it's at page 22 of their brief, that an exchange that HHS sets up is supposed to be the same exchange, and then petitioners say function just like an exchange that the State sets up for itself. You're putting a lot of weight on one word, such, such exchange. It seems to me the most unrealistic interpretation of such to mean the Federal Government shall establish a State exchange. Rather, it seems to me such means an exchange for the State rather than an exchange of the State. How can the Federal Government establish a State exchange? That is gobbledygook. So such must mean something different. It isn't gobbledygook, Justice Scalia. And I think about it, and I'll go back to something that Justice Alito asked earlier, in that if the language of 36b were exactly the same as it is now, and the statute said in 1321 that an exchange set up by HHS shall qualify as an exchange established by the State for purposes of Section 1311, you wouldn't change the language of 36b, and there wouldn't be any doubt in anyone's mind that subsidies were available on Federal exchanges. And what we're saying is that effectively reading 1311 and 1321 together, that is what the statute does. And that certainly that is a reasonable reading of the statute. It is really the only reading of the statute that allows you to be faithful to the text of 1311b1, the word shall, and to the Tenth Amendment. The word such means not just the exchange that the State was supposed to set up, but it means the State exchange. It means an exchange that qualifies as an exchange established by the State because it satisfies the requirement of 1311b1. You have to say it means the State exchange. Your case hinges on the fact that a Federal exchange is a State exchange. It hinges on it qualifying as the State exchange or being equivalent to the State exchange for purposes of the operation of the statute. That is a reasonable reading of the particular textual provisions, and once you've concluded that it's a reasonable reading of the particular textual provisions, then you have to read it the way that we say it is to be read because it's the only way to make sense of the statute as a whole. It's the only way to bring it into harmony with the Act's qualified individual and qualified health plan provisions, which do lead to what they admit is an absurdity under their reading of the law. Would you agree that there are provisions of the Act where the exact same phrase, established by the State, has to be read to mean established by the State and not by HHS? There are some provisions like that. They've pointed out some, but I think they're wrong about each one. All right. Let's take one. And I'd be interested in your answer to it. 42 U.S.C., Section 1396 W-3H1D, which says that each State shall establish procedures to ensure that an exchange established by the State utilizes a secure electronic interface. And they say that if that is read to, if exchange established by the State there is read to mean an HHS exchange, that means that the State in which that exchange is established is responsible for making sure that the Federal exchange has a secure electronic interface. Yeah, they're just wrong about that. It's just completely wrong. The statute says that the State shall, first of all, the statutory obligation is addressed to the State Medicaid and CHIP agencies. What it says is they shall establish procedures to ensure the coordination. HHS has issued regulations setting forth what that statutory provision requires of States in those circumstances. Every State where there's a federally facilitated exchange has met the requirements and fulfilled them, and it works perfectly fine. There's no anomaly there at all. It met the requirements of the regulation, you say. But do the regulations track the statute? Yes, they do. Do they give the State authority to say whether or not these conditions have been met? The requirements are imposed on the State Medicaid and CHIP end of the relationship. That's what the statute does, and the regulations implement that statutory requirement, and it's satisfied in every State. And of course, as Your Honor, reading it to me said, it does say, and I do think that proves our point, the statute says each State shall. It doesn't say States that have set up exchanges for themselves shall. It says each State shall. It presupposes that there's going to be something that qualifies as an exchange established by the State in every State. So there's no anomaly there. If Your Honor wants to ask me about any of the other ones, you can, but there are no anomalies, frankly. But I think, and I understand your answer to be that there are Federal regulations telling the States what they have to do here, and they've all done it. But the fact remains that the State has some obligation under the regulations to make sure that there's a proper interface with the Federal exchange. On the State's side of the interface, yes. But that's the CHIP and Medicaid agencies. Those are State government agencies, and it's their side of the interface that the statute governs. And as I said, I don't think there are anomalies with our reading, but if there are, they pale in comparison to the anomalies on the other side. And I really do want to focus on this point about the qualified health plan and the qualified individual, because the statute is quite clear in Section 1311 that an exchange, not an exchange established by the State, but an exchange can only sell a qualified health plan. It is forbidden from selling a health plan that is not a qualified health plan. And that's not an exchange established by the State. It's an exchange. Now, the statute also says that to certify a health plan as qualified, the exchange has to decide that it is in the interest of qualified individuals. Now, qualified individuals are persons who reside in the State that established the exchange. So if you read the statute, the language, the way Mr. Carvin reads it, instead of the way we read it, you come to the conclusion in the State with a federally facilitated exchange, there are no qualified individuals. Therefore, the exchange cannot certify a qualified health plan as being in the interest of qualified individuals because there aren't any. So there aren't any qualified health plans that can lawfully be sold on the exchange. What is the provision that says that only a qualified individual can enroll in a plan under an exchange? So I will address that, but I just want to make clear the provision I'm talking about with respect to the prohibition on selling a qualified health plan to anybody on anything other than a qualified health plan on an exchange is 1311D-2B, which is at page 8A of the appendix to our brief. It's absolutely unambiguous. An exchange, not an exchange established by the State, an exchange may not make available any health plan that is not a qualified health plan. So a qualified health plan, but what's the provision you were referring to when you said that an exchange may enroll only a qualified individual? Well, what the statute says throughout is that qualified individuals are eligible to purchase on exchanges, and it's the necessary meaning of that phrase that if you are not a qualified individual, then you are not eligible to purchase health care on an exchange because otherwise the word qualified would not have any meaning. The meaning of the word qualified is distinguished between people who are eligible and people who are ineligible, and as a policy matter it wouldn't make any sense because think of the people who are not qualified individuals, the people who don't live in the State, the people in prison, and they're unlawfully documented. Part of Section 1312, a person qualified to purchase on an exchange must, quote, reside in the State that established the exchange. Right. And there are no such people in 34 States under Mr. Carvin's theory of the statute, so it just doesn't, you've just run into a textual brick wall. Well, I understand your argument is that it's a logical inference from a number of provisions that only a qualified individual may purchase a policy, but I gather there is no provision that you can point to that says that directly. Well, that's what qualified means, Justice Alito. It means that, you know, if you're not qualified, you're unqualified. And so that's what it means. And so you're just reading the word qualified out of a statute if you read it that way. Qualified is used in the lay sense of the term. It's not a technical term here. Well, given the way it's defined, it's defined as a person who resides in the State. It excludes people out of State. It does that because the statute was quite clear that you weren't going to be allowed to shop for insurance policies across State lines because that would infringe on traditional State prerogatives regulating insurance. And with respect to prisoners, it doesn't make any sense to say that prisoners should be able to get insurance. Mr. Carvin says, yes, it does, because they get out of prison. Well, there's a specific statutory provision that says when you face a changed-life circumstance such as getting out of prison, you can sign up for insurance at that point. He makes the point about unlawfully present persons being both unqualified and not being able to be covered. But that's not surplus. That's there for a very important reason, which is that somebody can be in lawful status and therefore be eligible for health care but then lose lawful status, and at that point they can no longer be covered. So none of that works for them. None of that works for them. But really to get to the fundamental point here, that both at the level of text you have clear, irresolvable conflicts so that the statute can't work if you read it Mr. Carvin's way. You have at the level of text. Is that a synonym for ambiguity? I think so. Exactly right, Justice Scalia. I mean, excuse me, Justice Kennedy. That you have ambiguity there precisely because you have to – this is a statute that's going to operate one way or the other. And the question is how it's going to operate. And when you read it their way – Well, if it's ambiguous, then we think about Chevron. But it seems to me a drastic step for us to say that the Department of Internal Revenue and its director can make this call one way or the other when there are billions of dollars of subsidies involved per year, hundreds of millions. Yes, there's billions of dollars of subsidies involved per year. But two points about that. And it seems to me our cases say that if the Internal Revenue Service is going to allow deductions, usually it has to be very, very clear. And it seems to me a little odd that the Director of Internal Revenue didn't identify this problem if it's ambiguous and advised Congress it wasn't. So a few points about that with respect to Chevron deference. First, we do think Chevron deference clearly supports the government here, and I'll explain why. But before you get to that, you can resolve and should resolve this statute and the statute's meaning in our favor even without resort to Chevron deference. That's what the canon of reading statute as a whole to make it work harmoniously directs you to do. It's what the very important principles of federalism that we've been describing here direct you to do. If you think there's a constitutional problem with the statute, it's what the Doctrine of Constitutional Avoidance directs you to do. Now, with respect to Chevron, Section 36BG of the statute expressly delegates to the IRS the specific authority to make any decisions necessary to implement Section 36B. So you don't have any ambiguity. Congress said the IRS should do this. It is a big question. But as the Court said in City of Arlington two terms ago, Chevron applies to big questions as well as small. Your Honor raised this point about the need for clarity in a tax deduction and IRS in the statutory reading of tax deductions. There is a learned treatise that describes that as a false notion, and it's certainly not consistent with this Court's unanimous decision in Mayo two terms ago that Chevron applies to the tax code like anything else. If you're right about Chevron, that would indicate that a subsequent administration could change that interpretation? I think a subsequent administration would need a very strong case under Step 2 of the Chevron analysis that that was a reasonable judgment in view of the disruptive consequences. So I said I think you can resolve and should resolve this case because the statute really has to be read when taken as a whole to adopt the government's position. If there are any tax attorneys in the courtroom today, I think probably they wrote down what you just said. When we get future tax cases, the United States is going to argue that we should not read them to, you know, there should be no presumption that a tax credit is provided by that statute. You should read it according to its terms. And when you read this provision according to its terms and you read it in context and you read it against the background principles of federalism, you have to affirm the government's interpretation. Thank you. Thank you, General. Four minutes, Mr. Carvin. Thank you, Mr. Chief Justice. Very quickly on standing, Mr. Hearst would be subject to a penalty, absent relief by this Court for 2014. As I've discussed, both he and Mrs. Levy, of course, would face the same principle for 2015. If the government is suggesting that their case has become moot because of changed circumstances, under Cardinal Chemical 508 U.S. 8.3, it's their burden to raise it, not ours to supplement the record. In terms of the anomaly, in terms of all the states losing, 34 states losing their Medicaid funds, the Solicitor General greatly distorted the statute. It's printed at 64A of their exhibit. It says a state shall establish procedures, so the notion that HHS established them is obviously contrary to that. It says the state will identify people to enroll on their exchanges. Well, they can't enroll anybody on their exchanges if there are no such exchanges in the state. Therefore, by the plain language, if you adopt the notion that exchange established by the state means established by HHS, all of them need to lose their Medicaid funding. Could I follow up on something the General ended with, which Justice Kennedy referred to, which is the need to read subsidies limited, but so is in a limited way, but so is the need to ensure that exemptions from tax liability are read in a limited way. And under your reading, we're giving more exemptions to employers not to provide insurance, more exemptions to states and others or to individuals. How does that work? I mean, you've got two competing... No, no, you do get more exemptions for employers under our reading, and the same principle applies. Is it unambiguous? It's undisputed that that one is unambiguous. Well, the dispute here is whether or not if they win under ambiguity, and they don't because the canon requires unambiguous statutes not to afford the tax credit. In terms of the employer mandate, I think that's very helpful in terms of Justice Kennedy's concern about federalism. Under their view of the statute, the federal government gets to unilaterally impose on states, there's an amicus from Indiana describing this, a requirement that states insure their own individuals. It implies the employer mandate the state. So there, under their theory, the states are absolutely helpless to stop this federal intervention into their most basic personnel practices, whereas under our theory, they are able to say no. So actually, the more intrusive view of the statute is there. In terms of the funding condition head-on, Your Honor, I think my short answer is as follows. There's no way to view this statute as more coercive or harmful than the version of Medicaid that was approved by this court, NFIB. And indeed, the NFIB dissenting opinion pointed to this provision as something that was an acceptable, non-coercive alternative. But in all events, even if there's a constitutional doubt under a novel constitutional question, as Justice Scalia pointed out, there's no alternative reading of the statute that avoids that because either way you're intruding on state sovereignty. In terms of the anomaly, in terms of qualified individuals, as predicted, Solicitor General did not come up here and tell you, yes, if we prevail here under this theory, they're going to have to empty out the HHS exchanges. Nor did he even respond to my argument that with respect to an exchange under the definitional section only applies to state exchanges. So I think we can view this as a complete and tendentious litigation position and not a serious statutory interpretation. In terms of the qualified health plan that he discussed with you, Justice Alito, the complete answer to that is that is in 1311. 1311 only is talking about state-established exchanges. It has no application to HHS exchanges. Therefore, it can't possibly create an anomaly with respect to those HHS exchanges. Thank you, counsel. Case is submitted.